UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-09-270 |
| | § | |
| | § | |
| STEVEN WALTER COOKE *in custody* | § | |

MEMORANDUM AND ORDER

Pending before the court is defendant Steven Cooke's first amended motion to suppress. Dkt.
44. After consideration of the motion, the response, the reply, the evidence and arguments put forth
in hearings held on the matter, and the applicable law, the court finds that the motion should be
DENIED.

I. Background

On October 16, 2008, Cooke, a convicted felon, was arrested along with two of his friends
by the Polk County Sheriff's office following a call to the police about a disturbance at a motel in
Livingston, Texas. Dkt. 44 at 2. Although Cooke was not the initial subject of interest, the officers
asked Cooke for his consent to search his pickup truck and he agreed. *Id.* The officers found a
firearm under the passenger side of the vehicle and they subsequently acquired a search warrant
authorizing a search of two motel rooms and the pickup truck. *Id.* During the second search of the
pickup truck, the officers found an additional weapon, as well as a camera, memory sticks, some
ammunition, and a trace amount of methamphetamine. *Id.* The camera was later found to contain
pictures of Cooke holding firearms other than those found in his truck. *Id.* at 3. The contents of
these pictures were communicated to law enforcement in Houston, Texas. Dkt. 48 at 7.

On October 23, 2008, while Cooke remained in jail in Polk County, Tomball police and ATF conducted a "knock and talk" at Cooke's house, located at 27826 Red Fox in Harris County, near Tomball, Texas.  Dkt. 44 at 3.  Just two days before the knock and talk, federal agents interrogated Cooke and apparently tried, unsuccessfully, to obtain his consent to search the home.  *Id.* at 9.  The only person at Cooke's house at the time of the knock and talk was Cooke's 78-year old mother, Ima Cooke, who had recently come to stay with Cooke after her home had been severely damaged by Hurricane Ike the month before.  *Id.* at 4.  Ms. Cooke eventually let the agents into the home, where they are apparently saw a shotgun shell lying on the floor and a gun safe.  *Id.* at. 5.  Based on this information, agents secured a search warrant for the home.  *Id.*  They subsequently executed the warrant and recovered numerous firearms, ammunition, and a bullet proof vest (body armor).  Dkt. 37 at 4.

In April, 2009, Cooke was tried before a federal jury in Lufkin, Texas, for being a felon in possession of the firearms and ammunition discovered in his pickup truck.  Dkt. 44 at 3.  At the trial, one of Cooke's co-defendants, Mr. Michaels, testified that the weapon and ammunition belonged to him and not Cooke.  *Id.*  Cooke was ultimately acquitted on all charges.  *Id.*

In the present case, Cooke was charged in a criminal complaint on April 24, 2009, as being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).  Dkt. 37 at 1.  An indictment was later returned against Cooke on May 20, 2009.  Cooke now moves this court to suppress evidence found during the search of his pickup truck (Polk County search) and the search of his home (Harris County search).  Dkt. 44. at 1.

## II. Analysis

Cooke asks this court to suppress (1) the camera, memory sticks, and photographic images found in his pickup truck as part of the Polk County search, and (2) the firearms, ammunition, and body armor found in his home as a result of the Harris County search.

### A.      Polk County Search

#### 1.      Standard of Review

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend IV. The purpose of the particularity requirement is to prevent general searches. *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013 (1987). "The fourth amendment requires not only that the warrant sufficiently specify the evidence to be seized, but also that the scope of the warrant be limited to the specific areas and things for which there is probable cause to search." *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988) (citing *Garrison*, 480 U.S. at 107).

A motion to suppress is analyzed through a two-part analysis. First, the court determines whether the evidence at issue was obtained by law enforcement officials acting in "objectively reasonable good-faith reliance upon a search warrant." *United States v. Shugart*, 117 F.3d 838, 843 (5th Cir. 1997). The good faith exception provides that "[i]f an officer's 'reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues [is] objectively reasonable,' a court need not suppress the fruits." *United States v. Flanders*, 468 F.3d 269, 271 n.2 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct 3405 (1984)). Generally, it is presumed that it was objectively reasonable for an officer to execute a warrant. *See United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (endorsing a district court's

3

statement that only in "exceptional circumstances" does the good faith exception not apply to the execution of a warrant). There are, however, four exceptions when this presumption is overcome: (1) when the warrant is issued in reliance upon a deliberately false affidavit; (2) when the magistrate abandons his neutral, detached judicial role; (3) when the warrant is based on an affidavit so lacking in indicia of probable cause as to render an officer's belief in it unreasonable; and (4) when the warrant fails to identify a particular place to be searched or items to be seized. *Id.* at 916–17 (citing *Leon*, 468 U.S. at 914).

If the good-faith exception does not apply, then the second step is to determine if there was a substantial basis for finding probable cause. *Id.* Probable cause exists where there are "reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of a crime." *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006) (citing *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317 (1983)). The supporting affidavit must show some nexus between the items to be seized and the criminal activity being investigated. *Id.* (citing *Warden v. Hayden*, 387 U.S. 294, 302, 307, 87 S.Ct. 1642 (1967)). Although a magistrate's determination of probable cause is afforded great deference, a warrant is deficient if it is based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 914–15, 104 S.Ct. 3405 (1984).

2.     *The Polk County Search Warrant*

Cooke initially consented to a search of his pickup truck when the officers arrived at the motel in Livingston. Dkt. 44 at 2. This search yielded a firearm, found under the passenger side of the vehicle. *Id.* An officer then applied to the magistrate judge for a warrant to further search the

4

pickup truck as well as two hotel rooms for evidence of illegal drug activity.[1]  *Id.*  The warrant is a
short form that simply adopts the accompanying affidavit and limits the search to the parameters
outlined in the affidavit.  *See* Dkt. 44, Ex. A.  The affidavit itself states that affiant officer believed
the suspects possessed:

> Controlled substances, including but not limited to methamphetamine, equipment
> and chemicals to manufacture methamphetamine in and around the rooms and
> vehicles as well as any books, ledgers, or records of drug transactions **including any**
> **electronic media capable of storing such records**, and other evidence linking
> suspected suspect(s) to the crime.

*Id.* (emphasis added).  The basis for probable cause is listed at the bottom of the affidavit and states:
"See Exhibit 'A' attached which is incorporated herein by reference."  *Id.*  The attached exhibit 'A'
is a statement by the affiant officer that details the facts of the call concerning the motel, including:
what the caller said he saw, the officers' actions, the consent given by the suspects to search the hotel
rooms and the pickup, and most importantly what the officers found during this consensual search.
*Id.*  The evidence they discovered included "weapons, methamphetamine and a book on how to
manufacture methamphetamine," found in the pickup truck and one of the hotel rooms.  *Id.*

Cooke argues that the warrant lacked sufficient probable cause to include "any electronic
media capable of storing records" and, therefore, the seizure of the camera and memory sticks from
Cooke's truck was unreasonable and beyond the scope of what was particularly described and
authorized.  Dkt. 44 at 8–9.  Specifically, the camera and memory sticks were not mentioned in the
items discovered in the first consensual search, nor does the affiant officer list "any basis for
believing that any books, ledgers, or record of drug transactions including any electronic media
capable of storing such records would be found."  *Id.*  Additionally, there was no mention that in the

---

[1]Although Cooke was subsequently arrested and tried for being a felon in possession, the Polk County
search warrant was sought for "controlled substances." Dkt. 44, Ex. A (affidavit for search warrant, ¶ 2).

officer's experience with drug seizures that cameras and photographs are commonly found. *Id.* In its response, the government argues that there was indeed probable cause to include "electronic media" in the warrant and even if the court should find the warrant lacked probable cause, the good faith exception applies and the evidence should not be suppressed. Dkt. 48 at 11–12.

Although Cooke has presented some evidence that the affidavit may have lacked probable cause to support the inclusion of electronic media in the warrant, that is not where the court's analysis begins. Instead, the court starts with the premise that the good-faith exception applies to the Polk County warrant unless one of the four exceptions is met. In this case, Cooke asks the court to find the good faith exception does not apply because the affidavit supporting the warrant was "bare bones" with respect to the electronic media. Suppression Hearing, Jan. 25, 2010. This argument, however, is unpersuasive.

A "bare bones" affidavit is one "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Payne*, 341 F.3d 393, 399–400 (5th Cir. 2003) (quoting *United States v. Webster*, 960 F.2d 1301, 1307 n.4 (5th Cir. 1992)). A bare bones affidavit typically contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Pope*, 467 F.3d at 920. For example, statements such as the affiant "has cause to suspect and does believe" or "has received reliable information from a credible person and does believe" that contraband is located on the premises. *United States v. Brown*, 941 F.2d 1300, 1303 n.1 (5th Cir. 1991). That is not the situation before the court. Exhibit "A" of the affidavit contains ten factual paragraphs that provide great detail as to the circumstances of the call to the motel and what the officers found— including the fact that the officers found weapons, methamphetamine, and a book on how to manufacture methamphetamine. Dkt. 44, Ex. A to Ex. 1. Given this detail, the court finds the

6

affidavit is not so bare bones as to render official belief that there was probable cause "entirely unreasonable."

Cooke has failed to show the court that one of the exceptions to the good faith exception applies and, therefore, the court's inquiry ends here. The motion to suppress with regard to the camera, memory sticks, and photographs is denied.

**B.     Harris County Search**

*1.     Standard of Review*

The Fourth Amendment protects the "curtilage" of the home from unconstitutional searches. *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134 (1987). The curtilage is an area of the home where a person may reasonably "expect that the area in question should be treated as the home itself." *Id.* Four factors are traditionally considered when determining whether an area is curtilage: (1) the proximity of the area to the home itself; (2) whether the area is within an enclosure surrounding the home; (3) the use of the area; and (4) the steps taken to protect the area from outside observation. *Id.* at 301. These factors are not to be "mechanically applied;" rather they help to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301; *United States v. Thomas*, 120 F.3d 564, 571 (5th Cir. 1997).

"Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants"). Whether consent to search is given voluntarily is a question of fact to be determined by the totality of the

circumstances and is reviewed for clear error, especially where the finding is based upon oral testimony at the suppression hearing. *Schneckloth v. Bustamante*, 412 U.S. 218, 227, 93 S.Ct. 2041 (1973); *United States v. Mata*, 517 F.3d 279, 290 (5th Cir. 2008). "Voluntariness is determined by the totality of circumstances, which a court evaluates by considering six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." The government bears the burden to show by a preponderance of the evidence that consent was given voluntarily. *United States v. Hurtado*, 905 F.2d 74 (5th Cir. 1990). If consent was not given voluntarily or the search is otherwise invalid, the search warrant derived from the search and the evidence thereafter must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407 (1963).

Consent to search may be given by a third party with common authority over the premises to be searched. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793 (1990); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988 (1974); *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991). If the defendant "has already substantially ceded his expectation of privacy" to the third-party, then the defendant has "assum[ed] the risk" that the third-party might expose his or her privacy interest to others. *United States v. Shelton*, 337 F.3d 529, 535–36 (5th Cir. 2003). Moreover, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he has obtained valid consent to search the area." *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997). It is the reasonableness of the officers' conduct and "not what the consenting party

knows" that is the focus of the Fourth Amendment inquiry under the apparent authority doctrine. *United States v. Tames*, 353 F.3d 606, 615 (8th Cir. 2003).

       2.      *Knock and Talk at the Red Fox Home*

Cooke contends that the agents unlawfully entered the curtilage of the home when they conducted the knock and talk. Thus, the initial search of the home was unlawful because the agents lacked probable cause to conduct a warrantless search, and the evidence found within the home should be suppressed. *See* Dkt. 44 at 10.

Cooke's house is located on a wooded property, purportedly clearly marked with "No Trespassing" signs. Dkt. 44 at 4. The "house" is a metal, barn-like structure set back approximately 30 feet from the road and has no windows. *Id.* There is a prominently posted video camera that monitors who comes onto the property and a privacy fence that obstructs any view by neighbors from the rear and right sides of the property. *Id.* Entrance to the house is through two thresholds. First, a set of large, barn doors that were damaged by Hurricane Ike and thus left partially open at the time of knock and talk. Second, a set of double doors inside the structure that lead to the residence portion of the structure. *Id.*

The agents stated that they do not recall seeing the "No Trespassing" signs when they entered Cooke's property. Dkt. 37 at 5. Additionally, the agents did not consider the two barn-like doors a front door as they were "wide open" and the inside was "was almost completely visible from the street." *Id.* at 6. The area inside the barn-like doors appeared to be used for storage and did not appear to be an area "which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* at 7 (quoting *Ramirez*, 145 F. App'x. at 920–21). The agents merely went where any member of the public would have gone to knock at the defendant's front door. *Id.* at 8. Cooke, argues, however, that the area within the barn doors was an intimate living

9

area, open to the public only because of the damage that had been sustained just weeks before by Hurricane Ike.

Considering the curtilage factors, the court finds the area inside the barn doors is not curtilage. While this area is immediately adjacent to the second set of doors that lead to the undisputed living area of the home, the use of the area appears to be akin to a covered porch. *See* Govt. Exs. 2, 3, & 4. From the pictures, it is clear there is a sidewalk that traverses the entire area (which is otherwise just a dirt floor) and steps leading up to the second set of doors. This further reinforces the idea that this is some sort of porch or entryway to the main set of doors. *Id.* Based on this information, it seems wholly logical that the public would gain access to the house by walking through the partially open barn doors and up the sidewalk to knock on the second set of doors. Moreover, the area was only partially enclosed. Cooke's argument that the barn doors were partially open only because they sustained damage during the hurricane a few weeks before is unpersuasive. If anything it weighs in favor of the area not being considered curtilage—if this area was an intimate living space, why would it be left open to the elements for several weeks? For all of these reasons, the court finds that the area inside the barn doors is not entitled to the Fourth Amendment protection afforded to curtilage.

    *3.*    *Ima Cooke's Consent*

Cooke argues that (1) his mother Ima Cooke's consent to enter the home was not given voluntarily, and (2) even if Ms. Cooke's consent was given voluntarily, defendant Cooke's previous refusal to the FBI trumps Ms. Cooke's subsequent consent, and therefore, the agents unlawfully entered the home. Dkt. 44 at 9–11.

    a.    <u>Voluntariness of the Consent</u>

The parties' versions of events differ drastically with regard to the knock and talk. Cooke

says the agents purposely waited until Ms. Cooke was home alone and then "pounded on the door" for a period of thirty to forty-five minutes, even after Ms. Cooke conveyed to them "reluctance" to let the agents in.  Dkt. 44 at 10.  The agents ignored her protests and overbore her will by their persistence.  *Id.* When she eventually cracked open the door, the agents proceeded to enter and search the home.  *Id.*  The government contends, however, they spoke to Ms. Cooke only for a minute or two through the door and then she allowed them to enter the home.  Dkt. 37 at 9.  Even that amount of time was needed only because of noise in the surrounding area that is made it difficult to talk through the closed door.  *Id.*  According to the government, Ms. Cooke never asked the agents "to leave her door, get out of the residence, or acted afraid, nervous or intimidated in any way." *Id.* at 10.

The courts finds Ms. Cooke's consent was voluntary based upon an examination of the voluntariness factors.  Ms. Cooke was not in custody at the time of the knock and talk.  The procedures used by the agents seem reasonable under the circumstances.  Ms. Cooke appears to have cooperated with the agents, although perhaps initially reluctantly, likely because she did not believe that any incriminating evidence would be found.  Lastly, Ms. Cooke is an educated and intelligent woman, seemingly well aware of what is going on, as evidenced by the audio tapes submitted at the suppression hearing.  She surely was aware of her rights and the fact she could have refused to let the agents enter without a search warrant.  The government, therefore, has met its burden to show Ms. Cooke's consent was voluntary.

      b.    <u>Conflicting Consents</u>

It is undisputed that Ms. Cooke purchased the house in question.  Additionally, Cooke concedes that, at the least, Ms. Cooke had apparent authority to give consent to search the home.  Suppression Hearing, Jan. 25, 2010.  Cooke asks the court, however, to find that the entry was still

unlawful because Cooke had previously told the agents, just two days prior to the knock and talk, that they did not have his consent to search the home. Dkt. 44 at 11. Under *Randolph v. Georgia*, 547 U.S. 103, 126 S.Ct. 1515 (2006), the defendant urges, Cooke's objection invalidates Ms. Cooke's consent.

In *Randolph*, the Supreme Court established a rule "that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of the fellow occupant." *Id.* at 122–23. Randolph followed two cases in which the Supreme Court held that a co-tenant's consent to search was valid even though the defendant who potentially could have objected was either mere feet away or asleep at the time of the consent. *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988 (1974) (feet away in squad car); *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793 (1990) (asleep in apartment). The Court explained the distinction between these lines of cases:

> So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Randolph*, 547 U.S. at 121–22.

The Fifth Circuit has not expressly addressed *Randolph* in a situation similar to the one presently before the court. Other circuit courts, however, have. Two of those courts, the Seventh and Eighth Circuits, refused to extend *Randolph* this far. In *United States v. Henderson*, 536 F.3d 776 (7th Cir. 2008), the court found the co-tenant's consent valid even after the defendant voiced his strong objection to having his house searched and was subsequently arrested and removed from the home. Similarly, in *United States v. Hudspeth*, 518 F.3d 954 (8th Cir. 2008), the en banc court held a wife's consent to search the home was valid even though her husband refused to consent to the

12

search a few weeks before.  The court specifically focused on two factors to distinguish the case from *Randolph*: the defendant was neither physically present nor immediately objecting when the wife gave her consent.  *Id.* at 959.

The Ninth Circuit, however, has extended *Randolph* to the present situation.   In *United States v. Murphy*, 516 F.3d 1117 (9th Cir. 2008), one co-tenant refused to give consent to have his residence searched.  He was subsequently arrested and taken away by the police.  His co-tenant later arrived and gave his consent to search the residence.  The Ninth Circuit held the search invalid, holding that "when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first cotenant the search is invalid as to the objecting co-tenant."  *Id.* at 1124.

Although the Fifth Circuit has not expressly addressed this situation, a prior case, *United States v. Baldwin*, offers some guidance.  644 F.2d 381 (5th Cir. 1981).  In that case the defendant, Baldwin, was asked if he would consent to the search of his car and he refused; he was subsequently arrested and taken away.  His wife, however, later gave her consent to search the car and the search was upheld.  The court stated that "[a]lthough Baldwin previously had refused consent, his wife could still consent to a search of the automobile *where, as here, it appeared she had at least joint control over the auto*."  *Id.* at 383 (emphasis added).  Other Fifth Circuit cases have also stressed this aspect of joint control or common authority.  *See, e.g.*, *United States v. Hernandez-Zuniga*, 215 F.3d 483, 487 (2000); *United States v. Kelly*, 981 F.2d 1464, 1470 n.5 (1993).

In light of *Baldwin* and the Seventh and Eighth Circuit cases, the court finds Cooke's prior denial of the search does not invalidate Ms. Cooke's consent.  Ms. Cooke had at least the apparent authority, if not the actual authority, to consent and that is enough to override Cooke's prior objections.

In sum, the area inside the barn doors the agents traversed to conduct the knock and talk is not curtilage. Additionally, the government has met its burden with regard to the voluntariness of Ms. Cooke's consent to enter the home. Lastly, the fact that Cooke denied the agents consent to enter the home two days before the knock and talk does not invalidate Ms. Cooke's later consent, as she had at least apparent authority, if not actual authority, to allow the search. Cooke's motion to suppress with regard to the guns, ammunition, and body armor found in the home, therefore, is denied.

### III. Conclusion

For the reasons set forth above, defendant Steven Cooke's first amended motion to suppress is DENIED.

It is so ORDERED.

Signed at Houston, Texas, on January 27, 2010.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY